******************************************************
 The ‘‘officially released’’ date that appears near the
beginning of each opinion is the date the opinion will
be published in the Connecticut Law Journal or the
date it was released as a slip opinion. The operative
date for the beginning of all time periods for filing
postopinion motions and petitions for certification is
the ‘‘officially released’’ date appearing in the opinion.
In no event will any such motions be accepted before
the ‘‘officially released’’ date.
 All opinions are subject to modification and technical
correction prior to official publication in the Connecti-
cut Reports and Connecticut Appellate Reports. In the
event of discrepancies between the electronic version
of an opinion and the print version appearing in the
Connecticut Law Journal and subsequently in the Con-
necticut Reports or Connecticut Appellate Reports, the
latest print version is to be considered authoritative.
 The syllabus and procedural history accompanying
the opinion as it appears on the Commission on Official
Legal Publications Electronic Bulletin Board Service
and in the Connecticut Law Journal and bound volumes
of official reports are copyrighted by the Secretary of
the State, State of Connecticut, and may not be repro-
duced and distributed without the express written per-
mission of the Commission on Official Legal
Publications, Judicial Branch, State of Connecticut.
******************************************************
 IN RE GABRIELLA A.*
 (AC 36632)
 Lavine, Alvord and Harper, Js.
 Argued October 16—officially released November 25, 2014**

 (Appeal from Superior Court, judicial district of
 Hartford, Juvenile Matters, T. Santos, J.)
 Dana M. Hrelic, with whom was Brendon P. Lev-
esque, for the appellant (respondent mother).
 John E. Tucker, assistant attorney general, with
whom, on the brief, were George Jepsen, attorney gen-
eral, and Benjamin Zivyon and Patricia E. Naktenis,
assistant attorneys general, for the appellee (peti-
tioner).
 Valeria Caldwell-Gaines, for the minor child.
 Opinion

 ALVORD, J. The respondent mother, Tanesha E.,1
appeals from the judgment of the trial court terminating
her parental rights and denying her motion to revoke
commitment as to her daughter, Gabriella A.2 The
respondent claims that the court improperly (1) found
that the Department of Children and Families (depart-
ment) had made reasonable efforts to reunify her with
Gabriella, (2) found that she was unable to benefit from
reunification efforts, and (3) considered the best inter-
ests of the child in the adjudicatory stage of the proceed-
ings. We disagree with the respondent’s claims, and
accordingly, affirm the judgment of the trial court.
 The following facts and procedural history are rele-
vant to the respondent’s appeal. The trial court
described the respondent as having endured ‘‘extreme
long-term trauma . . . .’’ She reported having been
exposed to domestic violence between her mother and
her stepfather, and that her stepfather had tried to rape
her. The respondent gave birth to Gabriella on February
28, 2011, while visiting the United States for her broth-
er’s funeral.3 In April, 2011, the respondent left Gabriella
in Connecticut with a woman named Nicolette R. and
returned to Jamaica. Gabriella was removed from Nico-
lette’s home on August 25, 2011. The court described
the circumstances under which Gabriella was removed
as ‘‘relatively horrific . . . .’’ The petitioner, the Com-
missioner of Children and Families, filed a motion for
an order of temporary custody, which was granted on
August 29, 2011. Also on August 29, 2011, the petitioner
filed a neglect petition. The respondent returned to the
United States in September, 2011. On November 18,
2011, Gabriella was adjudicated neglected and commit-
ted to the care and custody of the petitioner. Gabriella
has been in her current foster placement since Decem-
ber, 2011.4 The respondent filed a motion to revoke
commitment in February, 2013. In March, 2013, the peti-
tioner filed a petition pursuant to General Statutes
§ 17a-112 to terminate the respondent’s parental rights
as to Gabriella for, inter alia, failure to achieve a suffi-
cient degree of personal rehabilitation.
 The trial was held over the course of five days, and
the court issued an oral decision rendering judgment
terminating the parental rights of the respondent as to
Gabriella.5 The court issued its findings on February
26, 2014. This appeal followed.
 I
 We first review the respondent’s claimed error as to
two findings made by the trial court. She claims that
the court improperly found (1) that the department had
made reasonable efforts toward reunification and (2)
that she was unable to benefit from reunification
efforts.6
 ‘‘A hearing on a petition to terminate parental rights
consists of two phases, adjudication and disposition.
. . . In the adjudicatory phase, the trial court deter-
mines whether one of the statutory grounds for termina-
tion of parental rights [under § 17a-112 (j)] exists by
clear and convincing evidence. If the trial court deter-
mines that a statutory ground for termination exists, it
proceeds to the dispositional phase . . . [in which] the
trial court determines whether termination is in the
best interests of the child.’’ (Footnote omitted; internal
quotation marks omitted.) In re Etta H., 146 Conn. App.
751, 755–56, 78 A.3d 295 (2013).
 ‘‘To terminate parental rights under [§ 17a-112 (j)] the
department is required to prove by clear and convincing
evidence that it has made reasonable efforts to reunify
the children with the parent unless the court finds that
the parent is unable or unwilling to benefit from reunifi-
cation efforts. In accordance with [§ 17a-112 (j)], the
department may meet its burden concerning reunifica-
tion in one of three ways: (1) by showing that it made
such efforts, (2) by showing that the parent was unable
or unwilling to benefit from reunification efforts or (3)
by a previous judicial determination that such efforts
were not appropriate. . . . The trial court’s determina-
tion of this issue will not be overturned on appeal
unless, in light of all of the evidence in the record, it
is clearly erroneous.’’ (Citation omitted; internal quota-
tion marks omitted.) In re Ebony H., 68 Conn. App.
342, 348, 789 A.2d 1158 (2002). ‘‘A finding is clearly
erroneous when either there is no evidence in the record
to support it, or the reviewing court is left with the
definite and firm conviction that a mistake has been
made. . . . [G]reat weight is given to the judgment of
the trial court because of [the trial court’s] opportunity
to observe the parties and the evidence. . . . [An appel-
late court does] not examine the record to determine
whether the trier of fact could have reached a conclu-
sion other than the one reached. . . . [Rather] every
reasonable presumption is made in favor of the trial
court’s ruling.’’ (Internal quotation marks omitted.) In
re Keyashia C., 120 Conn. App. 452, 455, 991 A.2d 1113,
cert. denied, 297 Conn. 909, 995 A.2d 637 (2010).
 A
 The respondent first argues that the court erred in
finding that the department had made reasonable
efforts to reunify her with Gabriella. Specifically, the
respondent claims that the department’s efforts were
per se unreasonable, in that it (1) terminated the only
assistance, provided by Radiance Innovative Services
(Radiance), that she was receiving with regard to her
immigration status, (2) referred her to Dr. Beverly
Coker, a licensed clinical social worker, and then filed
a petition to terminate the respondent’s parental rights
before receiving Dr. Coker’s report, and (3) ‘‘contended
that the respondent failed to rehabilitate sufficiently
because she received the wrong type of trauma therapy
from [Dr. Coker], the therapist to which it referred her.’’
(Emphasis omitted.) The petitioner argues in response
that just because the treatment was unsuccessful does
not mean that the department did not make reasonable
efforts and that the department provided the respon-
dent with ‘‘a myriad of services,’’ including ‘‘mental
health treatment . . . to address [her] severe history
of trauma.’’ We conclude that there was sufficient evi-
dence in the record to support the court’s finding.
 ‘‘The reasonableness of the department’s efforts must
be assessed in the context of each case. The word
reasonable is the linchpin on which the department’s
efforts in a particular set of circumstances are to be
adjudged, using the clear and convincing standard of
proof. Neither the word reasonable nor the word efforts
is, however, defined by our legislature or by the federal
act from which the requirement was drawn. . . . [R]ea-
sonable efforts means doing everything reasonable, not
everything possible. . . . [R]easonableness is an objec-
tive standard . . . and whether reasonable efforts have
been proven depends on the careful consideration of
the circumstances of each individual case.’’ (Internal
quotation marks omitted.) In re Kyara H., 147 Conn.
App. 855, 872–73, 83 A.3d 1264, cert. denied, 311 Conn.
923, 86 A.3d 468 (2014).
 The trial court, in its February 19, 2014 oral decision,
recounted the efforts made by the department. First, it
noted that the department consistently had referred the
respondent to providers who were of similar cultural
background, which the court recognized as a benefit
in seeking out appropriate treatment for her. Second,
the trial court discussed the parent education program
provided through Radiance and remarked that the
respondent was able to make some gains, but was
unable to achieve the goal of ‘‘provid[ing] a safe environ-
ment for her children.’’7 Third, the trial court discussed
the other services provided by Radiance, which con-
sisted of counseling to assist the respondent with
depression and unstable housing. Fourth, the court dis-
cussed the treatment provided by Dr. Coker, and it
explained that the respondent also made some progress
in that setting. Fifth, the trial court noted the availability
of a nonoffender caregiver program, which the respon-
dent attended early in her involvement with the depart-
ment. The trial court found that the department had
made reasonable efforts toward reunification, as
required by § 17a-112 (j).
 Our review of the record reveals that the evidence
presented at trial supports the finding that the depart-
ment made reasonable efforts to reunify the respondent
with Gabriella. The trial court issued specific steps; see
General Statutes § 46b-129 (b); which, in relevant part,
required the respondent to take part in both parenting
and individual counseling, and to make progress toward
the treatment goals of meeting Gabriella’s need for
safety and developing appropriate parenting tech-
niques, cooperate with service providers recommended
for counseling, and acquire and maintain adequate
housing and a legal income.
 The court heard testimony describing the services
provided to the respondent to achieve these goals. By
October, 2011, the department already had made two
referrals. The respondent was referred to the Wheeler
Clinic for a substance abuse evaluation, which revealed
that substance abuse was not an issue for her. The
respondent was also referred to the Greater Hartford
Children’s Advocacy Center’s nonoffender caregiver
group, a seven week program designed for parents
whose children have been sexually abused, to better
help her parent her child through the healing process.8
While the respondent completed the program and
scored high on the posttests, the program manager testi-
fied to her concerns that ‘‘most of the sharing was about
her own trauma or her own difficulties as compared
to—you know, how to support—how to better support
the child.’’
 The respondent was referred to Radiance in January,
2012, for services that included case management, men-
tal health assessment, and individual therapy. The
respondent was treated by Tamar Draughn, a licensed
professional counselor, who provided counseling and
individual psychotherapy. Draughn testified that the
respondent ‘‘did not keep her sessions regularly,’’ and
according to the discharge summary prepared by Radi-
ance, the respondent attended fourteen of the twenty-
four counseling sessions available to her from June,
2012, to December, 2012. The discharge summary,
which stated the reason for discharge as ‘‘[p]ayment
approval ended,’’ also noted that ‘‘[d]ue to inconsistency
in therapy sessions client has not made adequate prog-
ress in reaching her goals.’’
 Based partly on the recommendation from Radiance
that the respondent would ‘‘better benefit from a refer-
ral for individual counseling to a more intensive pro-
vider,’’ the department made a referral to the New
Beginnings Family Center, LLC (New Beginnings), with
Dr. Coker. The goals for treatment, which began with
Dr. Coker in January, 2013, included addressing the
respondent’s history of trauma, anger management, and
the impact of the respondent’s history on her ability to
parent her children adequately. Dr. Coker testified as
to the treatment she provided to the respondent, which
included establishing a good relationship, allowing her
to share her thoughts and feelings, and providing cogni-
tive behavioral therapy, among other modalities of
treatment.
 Despite being provided with a number of services,
the respondent argues that the department did not make
reasonable efforts toward reunification. She first argues
that the cessation of services through Radiance termi-
nated her only assistance with her immigration issues,
and for that reason this action by the department was
unreasonable. A review of the testimony presented
shows that the department’s termination of services
through Radiance was not unreasonable.9
 First, the department’s social worker testified to hav-
ing attended a meeting with the respondent’s case man-
ager and the director of the program at Radiance,
Charles Frazier. Frazier indicated that there was not
much more that Radiance could do to help the respon-
dent with regard to case management because her abil-
ity to obtain housing and employment was contingent
on her resolving her immigration status, which she
could not resolve without having a sponsor.10 Second,
the respondent had a poor record of attendance at Radi-
ance, having attended fourteen of the twenty-four ses-
sions available to her. Third, Radiance indicated in a
monthly service report that the respondent was ‘‘work-
ing closely with immigration and her lawyer to change
her status.’’ Therefore, the trial court’s determination
that the department made reasonable efforts is not
clearly erroneous merely because the department
ceased services through Radiance. The evidence
showed that the respondent was not solely relying on
Radiance to assist her with her immigration issues. Fur-
thermore, the other evidence related to the decision
to terminate services through Radiance was sufficient
such that the decision to cease services was not unrea-
sonable.
 The respondent next argues that the petitioner
wrongly filed a petition for the termination of her paren-
tal rights on March 14, 2013, days before receiving Dr.
Coker’s report, which is dated March 20, 2013. The
failure to await receipt of Dr. Coker’s report before
filing a petition to terminate the respondent’s parental
rights, in light of the entire record, ‘‘does not make the
overall efforts of the department fall below the level of
what is reasonable.’’ In re Alexander T., 81 Conn. App.
668, 673, 841 A.2d 274 (failure to provide referral for
psychiatric examination after psychologist who con-
ducted evaluation recommended such was not suffi-
cient to render department’s efforts unreasonable),
cert. denied, 268 Conn. 924, 848 A.2d 472 (2004). Prior
to referring the respondent to Dr. Coker, the department
already had provided the respondent with case manage-
ment services, parenting education, a nonoffender care-
giver program to help her support her child in healing
from sexual abuse, and treatment with a licensed pro-
fessional counselor at Radiance. When those treatment
sessions the respondent actually attended at Radiance
were not sufficient, the department provided more
intensive treatment through New Beginnings and Dr.
Coker. We thus conclude that the petitioner’s decision
to file the petition to terminate the respondent’s paren-
tal rights prior to receiving Dr. Coker’s report does not
render the trial court’s determination that the depart-
ment made reasonable efforts clearly erroneous.11
 The respondent also contends that the trial court’s
finding that the department made reasonable efforts is
clearly erroneous in light of the department’s position
that the respondent failed to rehabilitate because Dr.
Coker, to whom the department referred the respon-
dent, provided her with the wrong type of therapy. In
response to this argument, we note that the trial court
did not making a finding that Dr. Coker’s therapy was
the wrong type. In fact, the court stated to the respon-
dent that ‘‘[Dr. Coker had stated] that her integrative
approach to therapy was really helpful to you. And
clearly, you have made progress.’’ We cannot determine
that the trial court’s finding that the department had
made reasonable efforts is clearly erroneous where the
court heard evidence not only that the department fol-
lowed the recommendation of Reliance that the respon-
dent be provided treatment in a more restrictive setting
by referring her to Dr. Coker, but that the department
had already made significant efforts to provide the
respondent with appropriate services prior to referring
her to Dr. Coker.
 There is sufficient evidence to support the court’s
determination that the department made reasonable
efforts to reunify the respondent with Gabriella. We
thus conclude that the court’s finding that the depart-
ment made reasonable efforts was not clearly
erroneous.
 B
 The respondent next argues that the court erred in
finding that she was unable to benefit from reunification
efforts. Specifically, she argues that ‘‘[w]here the trial
court expressly based its decision that [she] was unable
to benefit from appropriate services on Dr. [Derek A.]
Franklin’s opinion that [she] was unable to benefit from
inappropriate services, its finding is clearly erroneous
. . . .’’ (Emphasis in original.) We are not persuaded.
 The trial court found that the respondent was unable
to benefit from the services provided to her, and stated
that its finding was based, ‘‘primarily, on Dr. Franklin’s
cognitive findings. . . . And his personality findings.
. . . Particularly in the personality area.’’ Dr. Franklin,
a clinical psychologist who performed an evaluation of
the respondent, issued a report containing a personality
functioning section, which presented information on
the various assessments he conducted and concluded
that ‘‘[o]verall, the data indicated that [the respondent]
is generally satisfied and sees little reason to change
and therefore unlikely to benefit from treatment. She
is capable of engaging in services; however, long-term
treatment efficacy is not likely.’’ The court expressed
in its articulation of its decision that ‘‘it was highly
unlikely, given Dr. Franklin’s testimony, that the respon-
dent would benefit from the services to the point where
she could ever become a capable parent for three year
old Gabriella. It is crucial to understand that the over-
arching inhibitor and obstacle here is the extreme long-
term trauma that the respondent has endured. The like-
lihood that this could occur in the foreseeable future
was simply not supported by the evidence in this
matter.’’
 The court’s reliance on its understanding of the testi-
mony and written report of Dr. Franklin, who performed
a psychological evaluation of the respondent, does not
render the court’s conclusion clearly erroneous. Dr.
Franklin spoke with Dr. Coker, reviewed data from
various reports, and administered tests to the respon-
dent. Dr. Franklin did testify as to concerns with the
treatment being provided by Dr. Coker, including that
timetables and goals were not set, and that he thought
that the treatment was not sufficiently focused on
trauma, which he opined should precede any work on
insight oriented therapy. He also testified as to attach-
ment theory and expressed concern that to begin
trauma focused therapy would prolong the period for
which Gabriella has been out of the care of the respon-
dent. Additionally, he shared his view about the respon-
dent’s capability of engaging in therapy, noting that ‘‘she
is capable of engaging in [therapy]. But it—you know,
in the same sense, I think I was saying that she doesn’t
believe that she has any problems that need to have
addressed. So, she is engaging in therapy, but why is
she engaging in therapy?’’
 The respondent’s argument in essence is that the trial
court based its finding on ‘‘an incomplete and inaccu-
rate understanding of Dr. Franklin’s testimony.’’ We
are mindful that our standard of review provides that
‘‘[g]reat weight is given to the judgment of the trial court
because of [the trial court’s] opportunity to observe the
parties and the evidence.’’ (Internal quotation marks
omitted.) In re Keyashia C., supra, 120 Conn. App. 455;
see also In re Jorden R., 293 Conn. 539, 559, 979 A.2d
469 (2009) (‘‘[t]he trial court, having heard the testimony
and observed the witnesses, [is] in a position far supe-
rior to the [Appellate Court] to judge the evidentiary
record as a whole’’ [internal quotation marks omitted]).
A review of Dr. Franklin’s testimony and report in its
entirety reveals sufficient support for the trial court’s
expressed understanding of his testimony, which the
court credited in finding that the respondent was unable
to benefit from reunification efforts.
 We note that the trial court also made other findings
that would support its conclusion that the respondent
was unable to benefit from the reunification efforts.
First, the court noted that the respondent was unable
to achieve the goal of providing a safe environment
for her children because her immigration status was a
significant barrier. Second, the court found that the
respondent ‘‘did not attend the individual counseling
sessions on a regular basis . . . .’’ Third, the court dis-
cussed the respondent’s close relationship with Beverly
Dixon, who opened her home to the respondent and
invited her to live there for as long as the respondent
wanted. The court was troubled that the respondent
got married without informing Dixon, noting that ‘‘it’s
those kinds of actions that would concern a court, who
is responsible for a small child.’’ Fourth, the court noted
the testimony of Regina S. Dyton, the program manager
at the Greater Hartford Children’s Advocacy Center,
that the respondent was more focused on her own
trauma than on learning how to respond to her chil-
dren’s trauma, and the court credited this testimony as
a more representative indication of ‘‘where I think you
might be along the spectrum of rehabilitation.’’
 In support of her argument, the respondent relies on
In re Vincent B., 73 Conn. App. 637, 645, 809 A.2d 1119
(2002), cert. denied, 262 Conn. 934, 815 A.2d 136 (2003),
a case in which this court determined that the trial
court’s finding that the respondent father was unable
or unwilling to benefit from reunification efforts was
not supported by clear and convincing evidence. The
trial court in In re Vincent B. relied on a psychologist’s
report that was based on evaluations completed prior to
the respondent’s successfully completing alcohol abuse
treatment. Id., 646. In that case, this court noted that
the trial court had heard testimony from a substance
abuse counselor that the respondent father was in a
much better position to benefit from the reunification
efforts by the department after completing his alcohol
treatment than he had been prior to completing such
treatment. Id., 645. Unlike the respondent father in In
re Vincent B., who had resolved his alcohol abuse
issues, the respondent in the present case has not suffi-
ciently addressed her history of trauma or her immigra-
tion status, both of which prevented her from being
able to benefit from the reunification efforts.
 We thus conclude that the trial court did not commit
clear error in making the additional determination that
the respondent was unable to benefit from reunifica-
tion efforts.
 II
 The respondent finally argues that the trial court
‘‘improperly commingled consideration of the best
interests of the child with a determination of whether
the respondent was able to rehabilitate in the adjudica-
tory phase of the proceedings.’’ The respondent con-
tends that the court improperly considered that
removing Gabriella from her foster home and returning
her to the care of the respondent could have potential
psychological harm. The respondent further argues that
certain remarks made by the trial court provide evi-
dence that the court improperly considered the best
interests of the child in the adjudicatory phase. We
disagree.
 ‘‘The factual determination for the court is whether
the parent has achieved rehabilitation as contemplated
under the statute, that is, rehabilitation sufficient to
render the parent able to responsibly care for the child.’’
In re Kyara H., supra, 147 Conn. App. 866. ‘‘Personal
rehabilitation as used in the statute refers to the restora-
tion of a parent to his or her former constructive and
useful role as a parent. . . . [Section 17a-112] requires
the trial court to analyze the [parent’s] rehabilitative
status as it relates to the needs of the particular child,
and further, that such rehabilitation must be foresee-
able within a reasonable time. . . . Rehabilitate means
to restore [a handicapped or delinquent person] to a
useful and constructive place in society through social
rehabilitation. . . . The statute does not require [a par-
ent] to prove precisely when she will be able to assume
a responsible position in her child’s life. Nor does it
require her to prove that she will be able to assume
full responsibility for her child, unaided by available
support systems. It requires the court to find, by clear
and convincing evidence, that the level of rehabilitation
she has achieved, if any, falls short of that which would
reasonably encourage a belief that at some future date
she can assume a responsible position in her child’s
life.’’ (Internal quotation marks omitted.) In re Janazia
S., 112 Conn. App. 69, 94, 961 A.2d 1036 (2009).
 ‘‘Our statutes and [case law] make it crystal clear
that the determination of the child’s best interests
comes into play only after statutory grounds for termi-
nation of parental rights have been established by clear
and convincing evidence. . . . [A] parent cannot be
displaced because someone else could do a better job of
raising the child. . . . The court, however, is statutorily
required to determine whether the parent has achieved
such degree of personal rehabilitation as would encour-
age the belief that within a reasonable time, considering
the age and needs of the child, such parent could assume
a responsible position in the life of the child . . . .’’
(Citation omitted; emphasis in original; internal quota-
tion marks omitted.) In re Zion R., 116 Conn. App. 723,
738, 977 A.2d 247 (2009).
 The trial court found by clear and convincing evi-
dence, in accordance with § 17a-112 (j) (3) (B), that
the respondent had ‘‘failed to achieve such degree of
personal rehabilitation as would encourage the belief
that within a reasonable time, considering the age and
needs of the child or youth, [she] could assume a
responsible position in the life of the child . . . .’’
 The respondent argues that the trial court improperly
relied on Dr. Franklin’s testimony concerning whether
removal of Gabriella from her foster home would cause
psychological harm. The court did reference Dr. Frank-
lin’s testimony on this point, but the court’s observation,
when considered in context, was related to the court’s
concern that the respondent potentially would not be
able to provide Gabriella with the necessary emotional
support. The respondent cites In re Zion R., supra, 116
Conn. App. 739, in which this court concluded that ‘‘the
[trial] court did not improperly consider the child’s best
interest during the adjudication phase but that it prop-
erly considered the child’s young age and need for per-
manency in finding that the respondent’s rehabilitation
was not foreseeable within a reasonable time.’’12 In the
adjudicatory section of its memorandum of decision in
In re Zion R., the trial court discussed the child’s need
for permanency and expressed concern about the dis-
ruption of removing the child from his foster parents
and being placed in the care of someone who had not
yet appropriately addressed his own mental health
issues. Id., 737–38. The court noted that the child would
be almost three years old before possible placement
with the respondent. Id., 738–39. This court reviewed
these findings and concluded that the trial court prop-
erly had considered both the young age of the child
and his need for permanency. Id., 739. The substance
of the trial court’s adjudicatory considerations in this
case are substantially similar to the adjudicatory consid-
erations noted by this court in affirming the judgment
in In re Zion R. Thus, we are guided to conclude in
this case that the trial court did not improperly consider
the best interests of the child in the adjudicatory phase
of the proceeding.
 The balance of the respondent’s argument concerns
remarks the court made from the bench, both in the
trial court’s oral decision and in its subsequent decision
denying the respondent’s motion for a stay, in which
the court framed its remarks using the best interests
of the child language. We are not persuaded, however,
that these remarks amount to the court’s improperly
considering the best interests of the child in the adjudi-
catory phase. For example, the respondent points to
the court’s language in its oral decision: ‘‘But it’s the—
it’s this nurturing and caring that in a young child is so
critical. And because the court is charged foremost and
first concerning the—that my concern has to be the
best interest of this child, I feel that I really cannot give
you even one minute more.’’13 Reading the remark in
context, we agree with the petitioner that it is reflective
of the court’s underlying concern for the respondent’s
ability to nurture and emotionally support a child as
young as Gabriella. Additionally, the remark supports
the court’s finding that the respondent would not be
able to assume a responsible position in Gabriella’s life
within a reasonable time. We are again mindful of our
standard of review, which provides that ‘‘every reason-
able presumption is made in favor of the trial court’s
ruling.’’ (Internal quotation marks omitted.) In re Mel-
ody L., 290 Conn. 131, 145, 962 A.2d 81 (2009), overruled
in part on other grounds by State v. Elson, 311 Conn.
726, 746–47, 754, 91 A.3d 862 (2014). We therefore deter-
mine that the remarks cited by the respondent, when
viewed in context, do not warrant a conclusion that
the court improperly considered the best interests of
the child during the adjudicatory phase.
 The judgment is affirmed.
 In this opinion the other judges concurred.
 * In accordance with the spirit and intent of General Statutes § 46b-142
(b) and Practice Book § 79a-12, the names of the parties involved in this
appeal are not disclosed. The records and papers of this case shall be open
for inspection only to persons having a proper interest therein and upon
order of the Appellate Court.
 ** November 25, 2014, the date that this decision was released as a slip
opinion, is the operative date for all substantive and procedural purposes.
 1
 The court terminated the parental rights of the child’s father in the same
proceeding, but he is not a party to this appeal. We therefore refer to the
respondent mother as the respondent in this opinion.
 2
 The respondent has seven children. Five of her children reside with their
father in Jamaica.
 3
 The respondent, a citizen of Jamaica, explains that she entered the United
States on a visitor’s visa.
 4
 The court found that Gabriella has bonded with her foster parents and
that they have indicated that they would like to be an adoptive resource.
 5
 The respondent filed a motion for articulation on May 1, 2014. The trial
court denied the motion, and the respondent filed a motion for review. This
court granted the motion for review and the relief requested therein. The
trial court issued an articulation on July 24, 2014.
 6
 The respondent challenges both of the trial court’s findings that the
department made reasonable reunification efforts and that she was unable
to benefit from reunification efforts. The respondent would have to prevail
on both of these claims in order to obtain relief because the petitioner is
not required to prove both circumstances. ‘‘Because the two clauses are
separated by the word ‘unless,’ this statute plainly is written in the conjunc-
tive. Accordingly, the department must prove either that it has made reason-
able efforts to reunify or, alternatively, that the parent is unwilling or unable
to benefit from reunification efforts. Section 17a-112 (j) clearly provides
that the department is not required to prove both circumstances. Rather,
either showing is sufficient to satisfy this statutory element.’’ (Emphasis in
original.) In re Jorden R., 293 Conn. 539, 552–53, 979 A.2d 469 (2009).
 7
 The respondent had orders of temporary custody pending with respect
to her two children residing in Connecticut. On October 21, 2013, the respon-
dent consented to termination of parental rights as to the older child, who
is not subject to this appeal.
 8
 E., the older of the two children living in Connecticut, reported being
sexually abused while she lived in Jamaica, and a forensic interview was
conducted at the Greater Hartford Children’s Advocacy Center.
 9
 The trial court noted in its oral decision that the respondent had made
achievements while at Radiance, but that she could not achieve all of her
goals because her immigration status prevented her from providing a safe
environment for Gabriella, and she was unable to connect the early trauma
she experienced with her current behavior. The respondent has failed to
cite legal authority for the proposition that the department’s many responsi-
bilities include providing assistance as to immigration issues.
 10
 The department’s social worker also testified that she prepared letters
for the respondent that the respondent could provide to immigration authori-
ties explaining that the respondent’s children were in the care of the peti-
tioner and that the plan, at that time, was for reunification.
 11
 More importantly, Dr. Coker’s report was available to the trial court
adjudicating the petition for termination of the respondent’s parental rights.
 12
 See also In re Janazia S., supra, 112 Conn. App. 96 (noting that respon-
dent mother ‘‘correctly assert[ed] that it would be improper for a court to
consider the child’s best interests in disregard of the statutory criteria’’ but
that trial court instead properly had considered respondent’s rehabilitation in
light of child’s emotional issues and need for permanency [emphasis added]).
 13
 The respondent cites other remarks made by the court in support of
her argument that the court improperly considered the best interests of the
child in the adjudicatory phase. First, the court noted in its oral decision:
‘‘And I do think that based on all of the evidence that I have before me—
including other evidence, other than what I have stated, but I did the high-
lights—that Dr. Franklin is correct in that it’s best at this time to terminate
your parental rights [as to] Gabriella . . . . And I feel that it is in the child’s
best interest to do so.’’ (Emphasis added.) Second, the court noted during
the hearing on the respondent’s motion for a stay of the judgment pending
appeal: ‘‘Again, we’re not putting any blame on [the respondent]. In fact,
when she stood before me, when I rendered the decision, I told her it wasn’t
her fault. And I also told her, I hoped she would go on with her therapy.
But it was my charge to deal with prong two, most importantly. And looking
at Dr. Franklin’s evaluation, which—and he—I can’t say—I’m not going to
say everything is—pin everything on Dr. Franklin in this matter. Because
there is plenty of other evidence that told me this was in the child’s best
interest. One of which is her birth date. It was just about the time the
termination occurred, and she was three.’’ (Emphasis added.)